**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS and BOGGS, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**November 20, 2012**

# In the Court of Appeals of Georgia

A12A0919. EZ GREEN ASSOCIATES, LLC v. GEORGIA-
      PACIFIC CORPORATION.

BOGGS, Judge.

This litigation arises from a contract between the parties regarding a proprietary system for applying grass seed.[1] EZ Green Associates, LLC ("EZ Green") brought this action for breach of contract and the covenant of fair dealing against Georgia-Pacific Corporation, its assignee, GP Cellulose, LLC (formerly Koch Cellulose, LLC), and BlueYellow LLC, a GP Cellulose subsidiary (collectively, "Georgia-Pacific"). Asserting that Georgia-Pacific breached the agreement by ceasing production and by failing to market the product, EZ Green sought damages as well as bad faith penalties and attorney fees under OCGA § 13-6-11. Georgia-Pacific filed

---

[1]By motion and order of the court, the record and briefs were filed under seal.

an initial motion for summary judgment, which was denied, then renewed its motion for summary judgment on additional grounds. EZ Green filed a motion for partial summary judgment on Georgia-Pacific's liability for breach of contract. The trial court denied EZ Green's motion and granted summary judgment in favor of Georgia-Pacific, finding no issue of material fact regarding (1) whether Georgia-Pacific made commercially reasonable efforts to sell the product, and (2) whether Georgia-Pacific had the right under the contract to cease production.

Because the record shows conflicts in the evidence regarding these issues, the grant of summary judgment in favor of Georgia-Pacific was error, and we therefore reverse. For the same reason, EZ Green was not entitled to partial summary judgment in its favor, and we therefore affirm that portion of the trial court's order. EZ Green also appeals the trial court's order denying its request for a privilege log. Because EZ Green has failed to demonstrate from the record that the trial court abused its discretion, we affirm that order.

The contract was originally entered into in 2003 between EZ Green and Georgia-Pacific and ultimately revised as of April 30, 2004. The contract provided that, for a period of five years, EZ Green would license its product to Georgia-Pacific, which would develop, manufacture, market, and sell the product. In May 2004, Koch

2

Cellulose, LLC purchased Georgia-Pacific's pulp division and acquired all of its assets, including the EZ Green agreement.

1. (a) EZ Green alleged that Georgia-Pacific breached the agreement when it failed to "act in a commercially reasonable manner" or use "commercially reasonable efforts" to develop, manufacture, market, sell, and distribute the product. The contract provided that Georgia-Pacific would make "a commercially reasonable effort" to sell the product, and further provided: "For purposes of this paragraph, EZ G[reen] agrees that [Georgia-Pacific] shall have been deemed to have met 'commercially reasonable efforts' if [Georgia-Pacific] sells the following product volumes," providing a yearly target volume in acres.

In its order granting summary judgment, the trial court found that "[EZ Green] has not pointed to any evidence from which a jury could conclude that [Georgia-Pacific's] efforts to sell the product were inconsistent with the efforts a reasonable business entity would have made under similar circumstances." It therefore granted summary judgment on EZ Green's claims.

We first note that the trial court found that "[t]he commercially reasonable standard applicable in this case has not been addressed by Georgia courts" and therefore relied upon Kansas law, citing a federal district court decision, *Kansas Penn*

3

*Gaming v. HV Properties*, 727 FS2d 1100, 1111 (IV) (C) (D.Kan. 2010), and South Carolina law, citing a Fourth Circuit decision, *Valtrol, Inc. v. General Connectors Corp.*, 884 F2d 149 (I) (4th Cir. 1989). According to the trial court, these decisions define "commercially reasonable efforts" as "an objective standard requiring that a business use the efforts that a reasonable business entity would have made under similar circumstances." (Punctuation omitted.) *Kansas Penn*, supra, 727 FS2d at 1111.

While our courts may not have addressed the application of "commercially reasonable" in this precise context, Georgia has long-established standards for evaluating commercial reasonability. The Uniform Commercial Code and the cases interpreting its provisions repeatedly look to and construe "reasonable commercial standards." See, e. g., OCGA §§ 11-2-103 (1) (b) ("'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."), 11-3-103 (a) (4) ("'Good faith' means honesty in fact and the observance of reasonable commercial standards of fair dealing.") 11-4A-105 (a) (6) ("'Good faith' means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."); *Hansford v. Burns*, 241 Ga. App. 407, 410-411 (2) (526 SE2d 896) (1999) (disposition of collateral under

4

OCGA § 11-9-504, now OCGA § 11-9-610); *Tifton Bank & Trust Co. v. Knight's Furniture Co.*, 215 Ga. App. 471, 474 (1) (b) (452 SE2d 219) (1994) (banking practice under former OCGA § 11-3-419 with respect to depositor's account). The federal district court decision relied upon by the trial court likewise looked to the Kansas Commercial Code for interpretation of "commercially reasonable efforts." See *Kansas Penn*, supra, 727 FS2d at 1111 (IV) (C).

Georgia courts have not held that interpretations of commercial reasonability are limited to cases brought under the Commercial Code. See, e.g., *Pakwood Indus. v. John Galt Assoc.*, 219 Ga. App. 527, 529-530 (1) (466 SE2d 226) (1995) (assignment of lease).

> Good faith is, if anything, a minimum standard of conduct in any contract. While this particular agreement does not come within the UCC, it is a commercial transaction in the broad sense and the legislature has specifically declared that good faith is a basic obligation in all such transactions. [OCGA § 11-1-203]. See also [OCGA § 13-4-20] which calls for "substantial compliance with the spirit, and not the letter only, of the contract" in its performance. "Good faith" is merely a shorter way of saying the same thing.

*Crooks v. Chapman Co.*, 124 Ga. App. 718, 719-720 (3) (185 SE2d 787) (1971) (contract action to recover earnest money on sale of radio station).

5

But even under the foreign law test applied by the trial court, to determine commercial reasonableness the "court should consider all relevant factors together as part of single transaction with ultimate test to be whether parties acted toward each other in good faith and in a reasonable manner." (Citation omitted.) *Kansas Penn*, supra, 727 FS2d at 1111 (C). And Georgia law is clear that "[w]hether reasonable commercial standards have been met is a question of fact to be resolved by the jury." (Citations omitted.) *Tifton Bank & Trust Co.,* supra, 215 Ga. App. at 474 (1) (b). Where there is evidence that a party "failed to act in a commercially reasonable manner," summary judgment is inappropriate. Id. See also *Hansford*, supra, 241 Ga. App. at 410-411 (2).

Here, the record reveals that the product initially was well-received by a major retailer, but efforts to bring the product to market were largely frustrated over a period of several years. Pointing to different parts of a voluminous record, EZ Green asserts that Georgia-Pacific's conduct was not commercially reasonable, and Georgia-Pacific asserts the opposite. But

> [w]hen ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions therefrom most favorably toward the party opposing the motion. Further, any doubts on

6

the existence of a genuine issue of material fact are resolved against the movant for summary judgment. When this Court reviews the grant or denial of a motion for summary judgment, it conducts a de novo review of the law and the evidence.

(Citation and punctuation omitted.) *Roberts v. Connell*, 312 Ga. App. 515, 515-516 (718 SE2d 862) (2011).

Here EZ Green presented some evidence that Georgia-Pacific failed to use commercially reasonable efforts to market the product. The parties expressly agreed in the contract that the achievement of a certain yearly volume of sales would demonstrate "commercially reasonable efforts," and that volume was not met. It is undisputed that there was substantial delay in bringing the product to market, and some evidence shows that the delay was at least in part due to Georgia-Pacific's conduct. This conduct included, but was not necessarily limited to: the creation of a subsidiary with minimal assets and no business record and then insisting that the retailer contract exclusively with that subsidiary; a lack of relevant business experience on the part of the individuals entrusted with the marketing plan; and a preoccupation with the sale of Georgia-Pacific's pulp division and creation of the subsidiary at the expense of the marketing plan, to the point of calculating "exit strategy," considering operation of the business "independent of EZG" as "an

7

essential piece of any exit strategy," and characterizing the participation of EZ Green as a "downside." EZ Green also presented evidence that the retailer was still willing to go forward, but Georgia-Pacific instead ceased production. Compare *Kansas Penn*, supra, 727 FS2d at 1111 (appellant "produced virtually no evidence and no argument to suggest that [appellee's] efforts . . . were anything other than in good faith or commercially reasonable.")

Georgia-Pacific contends, and the trial court found, that the retailer's contract requirements were "onerous." But this conclusion is not demanded by the evidence as a whole. While Georgia-Pacific asserts that the proposed retail contract included an indemnity for the retailer's own negligence, the text of the proposed agreement itself is never cited by the parties. Instead, they refer to testimony of individuals' recollections or impressions of the contents of the proposed agreement during negotiations that took place over a substantial period of time and which were admittedly "fluid." And some contradictory evidence was elicited from these and other witnesses that the negotiations made progress and eventually concerned a single issue: not the precise indemnity language but the unwillingness of Georgia-Pacific to assume any financial responsibility other than through its subsidiary. On its part, EZ Green presented some evidence that the requirements were reasonable,

8

particularly given Georgia-Pacific's decision to deal with the retailer only through a lightly capitalized startup subsidiary with no business history. See *Pakwood Indus.*, supra, 219 Ga. App. at 529-530 (1) (guaranty requirements commercially reasonable in light of financial difficulties of assignee).

From this evidence, a trier of fact could find that Georgia-Pacific's efforts to fulfil its obligations under the contract were not commercially reasonable. This question therefore must be resolved by the trier of fact, considering the conflicting testimony offered by the parties and their witnesses.

(b) EZ Green also alleged that Georgia-Pacific breached the contract when it unilaterally ceased production during the term of the contract. The trial court held that this did not constitute a breach, relying upon a provision of the contract that states: "If [Georgia-Pacific] during the Payment Period ceases production of [the system], then EZ G[reen] may terminate this Agreement and the exhibits and attachments hereto." The trial court found that production had declined to the point that "future conditions and circumstances could make continued production untenable, resulting in the decision by [Georgia-Pacific] to cease production, in which case EZ G[reen] would be authorized to terminate the Agreement." From this, the trial court reasoned that there was "nothing for EZ G[reen] to terminate if cessation of production acted

9

as a termination of the agreement by [Georgia-Pacific]," that the contract in that case would be meaningless, and that therefore as a matter of law Georgia-Pacific did not breach the agreement when it ceased production.

The trial court also relied upon *Winterchase Townhomes v. Koether*, 193 Ga. App. 161 (1) (387 SE2d 361) (1989), for the proposition that "a claim for breach of contract cannot survive where a party exercises its bargained-for rights." In *Winterchase*, a real estate purchase contract for a townhouse provided that the contract could be cancelled *at the purchasers' election* if the improvements to the property were "destroyed or substantially damaged before the closing." Id. at 162. We held that, "[a]s the parties agree that the townhouse was completely destroyed by . . . fire, there is no dispute that [the purchasers] timely exercised their option to cancel the contract," and summary judgment in their favor was properly granted. (Citation omitted.) Id. at 162-163. Here, in contrast, Georgia-Pacific seeks to rely upon a contract provision giving the option to terminate to EZ Green, not Georgia-Pacific.

Moreover, the parties vehemently disagree regarding the circumstances leading up to Georgia-Pacific's decision to cease production. The facts presented here would allow a finder of fact to conclude that Georgia-Pacific personnel were looking for "exit alternatives" and planning to "begin divesting" as early as two years before that

10

decision was made. And, as noted in Division 1 (a), EZ Green has presented some evidence tending to show that Georgia-Pacific failed to use commercially reasonable efforts to market the product or to negotiate with the retail purchaser in good faith. This is in contrast to *Winterchase,* supra, which in no way suggests that the party seeking to cancel the contract had any involvement in the destruction of the subject matter.

Both the trial court and Georgia-Pacific appear to rely on the principle of impossibility or impracticability of performance. But

> [u]nder general principles of contract law which continue under the Code because not displaced, difficulty, inconvenience, or unusual cost in performing, even though it may make performance of the contract a hardship, does not excuse a party from performance of an absolute, unqualified undertaking to do a thing that is possible and lawful. Mere unexpected difficulty or unforeseen expense encountered by the seller does not excuse nonperformance on his part. Thus, the fact that one who, as a dealer, had contracted to sell a stated quantity of produce would have to pay more for it than was contemplated by him when the sales agreement was entered into does not absolve him from his undertaking.

(Citation and punctuation omitted.) *Swift Textiles, Inc. v. Lawson*, 135 Ga. App. 799, 804 (219 SE2d 167) (1975). "The inability to control the actions of a third person

11

whose consent or cooperation is needed for the performance of an undertaking is ordinarily not to be regarded as an impossibility avoiding the obligation." *Bright v. Stubbs Properties, Inc.*, 133 Ga. App. 166, 167 (210 SE2d 379) (1974). And "[t]hat it may be unwise or disadvantageous or place a hardship on one party furnishes no reason for not enforcing the contract as made. [Cit.]" Id.

In light of the evidence presented, Georgia-Pacific cannot assert a right to unilateral termination of its obligations under the contract, based upon the results of its own conduct and a contract provision giving a right of termination to the other party to the contract. The trial court erred in granting summary judgment on this basis as well.

2. Because the evidence is in conflict with regard to Georgia-Pacific's conduct and the circumstances of the termination of the contract, for the reasons discussed in Division 1, partial summary judgment in favor of EZ Green on the issue of liability for breach of contract is likewise inappropriate. The trial court therefore did not err in denying EZ Green's motion for partial summary judgment.

3. In its final enumeration of error, EZ Green contends that the trial court abused its discretion in refusing to require Georgia-Pacific to supplement its interrogatory responses with answers rather than general references to more than

12

90,000 pages of documents. It complains that the court's ruling allowed Georgia-Pacific to withhold certain documents relating to its July 20, 2007 decision to repudiate the contract. The record reveals that the trial court held a hearing on "several discovery-related issues, including those raised in Plaintiff's November 9, 2010 letter to the Court and Defendants' Motion for Protective Order." Following the hearing, the court ruled that Georgia-Pacific was not required to provide EZ Green with a privilege log identifying the documents withheld from production "on account of the attorney-client privilege or work product doctrine," and that Georgia-Pacific "need not supplement their responses to [EZ Green's] First Interrogatories."

Our review of this claim of error is hindered, however, by EZ Green's failure to provide record citations in support of its argument. In its recitation of facts, EZ Green cites only to the transcript of the hearing on the matter and the trial court's ruling, and no citations to the record appear in the argument section of its brief on this issue. EZ Green argues that the trial court erred in failing to require Georgia-Pacific to supplement its interrogatory responses. But it fails to direct this court to the record location of Georgia-Pacific's interrogatory responses, EZ Green's first request for interrogatories, or the November 9, 2010 letter referred to in the trial court's order and upon which the court relied in its ruling.

Court of Appeals Rule 25 (a) (1) provides: "Record and transcript citations shall be to the volume or part of the record or transcript and the page numbers that appear on the appellate record or transcript as sent from the trial court." Court of Appeals Rule 25 (c) (2) (i) provides: "Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of such a reference, the Court will not search for or consider such enumeration." And "[i]t is not the function of this Court to cull the record on behalf of a party in search of instances of error. The burden is upon the party alleging error to show it affirmatively in the record." (Citation, punctuation and footnote omitted.) *Resource Life Ins. Co. v. Buckner*, 304 Ga. App. 719, 740 (7) (698 SE2d 19) (2010).

Based on EZ Green's failure to support its enumerated error with citations to the record, we need not consider it, particularly here where the record consists of 33 volumes totaling more than 7,000 pages. See id. (where company asserted trial court erred in holding certain privileged documents were discoverable, but failed to identify those documents in the record, this court declined to consider claim of error); *Walls v. Sumter Regional Hosp.*, 292 Ga. App. 865, 870 (3) (666 SE2d 66) (2008). We therefore have no basis upon which to consider EZ Green's contention that the trial court abused its discretion in denying its letter request for additional discovery.

14

*Judgment affirmed in part & reversed in part. Doyle, P. J. and Andrews, J., concur.*